**UNITED STATES DISTRICT COURT
DISTRICT OF COLORADO**

Civil Action No. 12-cv-02767

U.S. SECURITIES AND EXCHANGE COMMISSION,

                Plaintiff,

   v.

GEOFFREY H. LUNN,
DARLENE A. BISHOP, and
VINCENT G. CURRY,

                Defendants.

**COMPLAINT**

Plaintiff U.S. Securities and Exchange Commission ("Commission") alleges as follows:

**SUMMARY**

1.     This matter concerns a fraudulent investment scheme carried out by Defendant Geoffrey H. Lunn ("Lunn") through a fictitious business called Dresdner Financial ("Dresdner") that raised more than $5.77 million from at least 70 investors from throughout the United States and several foreign countries between February 2010 and February 2011. Defendants Darlene A. Bishop ("Bishop") and Vincent G. Curry ("Curry") played significant roles in the scheme by soliciting and lulling investors while receiving payments made from the investors' money.

2.     The Defendants marketed and sold securities under the guise of Dresdner's .44 Magnum Leveraged Financing Program ("Magnum Program"). The Defendants told investors that the Magnum Program offered guaranteed profits through a process that involved leasing and monetizing bank instruments. Although the timing and amount of the promised payouts varied,

many of the contracts that the Defendants entered into with the investors stated that an investment of $44,000 would yield a return of $2 million after 10-12 banking days.

3. Lunn did not use any of the investors' money as promised. Instead, Lunn used the money for non-investment purposes, including withdrawing more than $1 million in cash and Western Union transfers, giving $848,500 to three Las Vegas call girls, paying $1.3 million to individuals who helped market the scheme (including over $650,000 to Bishop and Curry), giving $1 million in a Ponzi-like payment to a favored investor, and using the remaining funds to pay for Lunn's personal and business expenses.

4. Through the activities alleged in this Complaint, the Defendants, directly or indirectly, have engaged and, unless enjoined by this Court, will continue to engage in transactions, acts, practices and courses of business that violate Sections 5(a), 5(c), and 17(a) of the Securities Act of 1933 ("Securities Act"), Sections 10(b) and 15(a) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 thereunder.

## JURISDICTION AND VENUE

5. The Commission brings this action pursuant to Sections 20(b) and 20(d) of the Securities Act [15 U.S.C. §§ 77t(b) and 77t(d)] and Section 21(d) the Exchange Act [15 U.S.C. § 78u(d)] seeking permanent injunctions, disgorgement of ill-gotten gains, prejudgment interest, and civil penalties against each of the Defendants.

6. This Court has jurisdiction over this action pursuant to Sections 20(b), 20(d) and 22 of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d) and 77v] and Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa]. The Defendants have, directly or indirectly, made use of the means and instrumentalities of interstate commerce, of the mails, or

of the facilities of a national securities exchange in connection with the acts, practices and courses of business alleged in this Complaint.

7. Venue is proper in this district pursuant to Section 22 of the Securities Act [15 U.S.C. § 77v] and Section 27 of the Exchange Act [15 U.S.C. § 78aa] because certain of the acts, transactions and courses of business constituting the violations alleged in this Complaint occurred within the jurisdiction of the United States District Court for the District of Colorado.

## DEFENDANTS

8. **Geoffrey H. Lunn**, age 56, resides in Sheridan, Colorado. Lunn is the principal of WGC Group, Inc., a Nevada corporation, through which all of the money intended for investment in Dresdner's investment programs was deposited. Lunn was never registered as a broker or associated with a registered broker-dealer.

9. **Darlene A. Bishop**, age 40, resides in Odessa, Texas. Bishop is the principal of JonDar Enterprises, LLC, a Texas limited liability company, through which she received compensation from Lunn for bringing investors to Dresdner. Bishop was never registered as a broker or associated with a registered broker-dealer. The United States Attorney's Office filed an indictment in the United States District Court for the Western District of Texas on April 25, 2012 charging Bishop with wire fraud, conspiracy to commit wire fraud and money laundering related to her involvement with an unrelated financial services company. United States v. Darlene Aurelia Bishop, Case No. 7:12-cr-00123-RAJ. The criminal case is scheduled for trial in January 2013.

10. **Vincent G. Curry**, age 42, resides in Las Vegas, Nevada. Curry is the principal of Nevada Capital Markets, Inc., a Nevada corporation, through which he received compensation

from Lunn for bringing investors to Dresdner. Curry was never registered as a broker or associated with a registered broker-dealer.

## FACTS

### I. Dresdner Financial and its Affiliates

11. Between February 2010 and February 2011, the Defendants participated in a fraudulent investment scheme under the auspices of a purported financial services company called Dresdner Financial. According to Dresdner's website (www.dresdnerfinancial.com), Dresdner had an "extensive network of connections with the Top-50 banking institutions in the world" and was the "leader in creative Commercial Financing, Bank Instruments, Bond Programs and more." The website provided a phone number and physical address for Dresdner in Chicago, Illinois.

12. In reality, Dresdner was not a real company but simply a name used to perpetuate the fraudulent investment scheme. Dresdner was not a legal entity of any type or a trade name for an actual company. Dresdner did not maintain an office in Chicago, or anywhere else, and the phone number listed for Dresdner was a prepaid cell phone registered under a false name.

13. In early 2010, Lunn began seeking "Affiliates" to invest with Dresdner and market Dresdner's investment programs to others. Lunn told the Affiliates, among other things, that he was the Vice-President of Dresdner, that Dresdner's principals had connections to Dresdner Bank (formerly one of Germany's largest banks), and that Dresdner was planning to acquire several banks to expand its operations. All of Lunn's statements about Dresdner were false.

14. The Affiliates entered into written agreements to market and sell Dresdner's investment programs in exchange for commissions. During sworn testimony before the Commission's staff, Lunn admitted that he signed Affiliate agreements on behalf of Dresdner.

15. Bishop and Curry were among those who agreed to serve as Affiliates.

16. Curry signed an Affiliate Agreement in April 2010. The Affiliate Agreement stated that Curry would receive commissions for selling Dresdner's investments. From at least May 2010 to November 2010, Curry marketed Dresdner's investment programs through emails, phone calls, and other means and received related payments from Lunn. During that time, Curry had no other source of significant income.

17. Bishop signed an Affiliate Agreement in August 2010. The Affiliate Agreement stated that Bishop would receive commissions for selling Dresdner's investments. From at least June 2010 to February 2011, Bishop marketed Dresdner's investment programs through emails, phone calls, and other means and received related payments from Lunn. During that time, Bishop had no other source of significant income.

## II. The Fraudulent .44 Magnum Leveraged Financing Program

18. The primary investment opportunity advertised by the Defendants and through Dresdner's website was the Magnum Program. Although its terms changed over time, the Magnum Program initially offered investors a guaranteed return of $2 million within 10 to 12 banking days on an investment of $44,000 (a return of 4,445%).

19. No registration statement was in effect or had been filed with the Commission as to the securities sold through any of Dresdner's investment programs, including the Magnum Program.

20. Dresdner's website stated that the Magnum Program was a "very exciting and incredibly dynamic program" that involved the "leasing" and "simultaneous monetization" of bank instruments.

21. Investors in the Magnum Program completed and signed several forms. The forms stated that the Magnum Program was "a 100% guaranteed program, by means of leveraging financial instruments (bank debentures)" and that "the actual returns are 100% guaranteed."

22. Defendants Curry and Bishop marketed the Magnum Program directly to investors through phone calls, emails and other communications. Defendant Lunn held conference calls with Affiliates and investors during which he explained the Magnum Program's workings.

23. The Defendants told investors and prospective investors that the Magnum Program involved complex financial transactions, including some or all of the following steps: 1) the investor would complete and submit the required paperwork; 2) Dresdner would ensure that the investor passed compliance and provide the investor with instructions for submitting the money via wire transfer; 3) Dresdner would use the investor's money to lease a bank instrument, such as a bank guarantee or standby letter of credit; 4) Dresdner would obtain an insurance wrap for the bank instrument; 5) Dresdner would monetize the bank instrument; 6) Dresdner would use a portion of the proceeds from the monetization to pay the investor the promised return; and 7) Dresdner would place the remaining proceeds into a trading platform to earn its profits.

24. During sworn testimony before the Commission's staff, Lunn admitted that he described the Magnum Program to investors and Affiliates as being 100% guaranteed.

25. The Defendants were highly successful in raising money for Dresdner's programs. Between February 2010 and February 2011, at least seventy investors from throughout the United States and several foreign countries transferred more than $5.77 million into a bank account controlled by Lunn for investment in Dresdner's programs, primarily the Magnum Program.

26. The defendants did not attempt to determine whether the investors were accredited investors. Further, at least some of the investors were not accredited investors.

27. From the start, the Magnum Program and all of Dresdner's other purported investment opportunities were nothing more than an elaborate hoax. During sworn testimony before the Commission's staff, Lunn succinctly described the Magnum Program by saying, "It was a con, basically." Lunn admitted that he did not use any of the investors' money as promised. He did not lease any bank instruments, obtain any insurance wraps, monetize any bank instruments or place any money into trading platforms. Nor did he return the money to investors. Instead, he misappropriated the money as described below.

28. Between May 2010 and November 2010, Curry brought at least 8 clients into the Magnum Program. In total, Curry's clients invested at least $847,990 with Dresdner. Curry played a central role in getting these clients to invest with Dresdner by explaining the Magnum Program to the investors, providing the investors with all of the program forms, and serving as their primary contact for updates and information. Curry often used a Dresdner email address, Vincent@dresdnerfinancial.com, to communicate with the investors.

29. Between July 2010 and February 2011, Bishop brought at least 21 clients into the Magnum Program. In total, Bishop's clients invested at least $1,452,000 with Dresdner. Bishop

played a central role in getting these clients to invest with Dresdner by explaining the Magnum Program to the investors, providing the investors with all of the program forms, and serving as their primary contact for updates and information.

30. After the investors sent their money to WGC Group, Inc., a company owned and controlled by Lunn, the Defendants told the investors numerous lies designed to prevent the investors from taking action and to continue the fraudulent investment scheme. Among other things, Lunn told the Affiliates and investors their investment returns would be paid out on a particular date and then proceeded to postpone the payout date by another five to seven days on multiple occasions. Lunn also told the Affiliates and investors that the insurance company was behind schedule in providing the insurance wraps for the bank instruments, that there was a delay in moving money in and out of the country, that the banks or the government had placed a hold on Dresdner's funds, that Dresdner's principals were working through tax reporting issues, and that the investors would receive even more money than they were originally promised as a result of the delays.

31. During sworn testimony before the Commission's staff, Lunn admitted that the information he told the investors about the delays was false. Lunn stated that he "prolonged the process and just made up excuses." Lunn often used a Dresdner email address, Geoff@dresdnerfinancial.com, to communicate with the Affiliates and investors. At other times, he told the Affiliates and investors that the updates would come from Michael Schmidt, purportedly Dresdner's Operations Manager who used the email address Michael@dresdnerfinancial.com. Lunn admitted to the Commission's staff that Michael Schmidt is not a real person.

32. Curry routinely repeated Lunn's false statements to his clients without regard for whether the statements were true. For example, on December 1, 2010, Curry forwarded an email from Lunn to an investor, stating that "[p]ayout should be sometime next week." On January 19, 2011, Curry informed a group of clients via phone calls and emails that their payouts would be available within a week. At various times during the course of the scheme, Curry told investors that their payouts were delayed as the result of problems with the leased bank instruments or issues with obtaining insurance wraps.

33. Bishop also routinely repeated Lunn's false statements to her clients without regard for whether the statements were true. For example, in an email she sent to several investors on October 24, 2010, Bishop stated that "[t]he reason for the current delays is [the insurance company] did not issue the insurance wraps until just a few weeks ago and Dresdner cannot monetize the instruments until the wrap is in place." On November 8, 2010, Bishop sent an email to an investor in which she stated that "the funds being in Dresdners [sic] Trading Account doesn't mean they are ready at that moment to be sent out because they have to get the Federal clearance before they can start funding clients…right now we are in the hands of the FEDs and awaiting their approval." In an email dated December 7, 2010, Bishop told multiple investors that she was "happy to inform you that your payout is ready to go and here is the final Acceptance Agreement that must be completely filled out and sent back to me as soon as possible."

34. Curry and Bishop continued to bring new investors into the Magnum Program, and receive related compensation from Lunn, after they learned that the program was not performing as promised.

35. The first investor that Curry brought into the Magnum Program transferred $44,000 to the bank account under Lunn's control on May 19, 2010. Curry told the investor that he would receive his guaranteed payment of $2 million within 30 days. However, the investor never received his promised payment or a return of his investment money. Despite knowing that his first investor had not been paid, Curry continued to portray the Magnum Program as a guaranteed investment vehicle to new clients. Curry brought at least seven investors into the Magnum Program between July 2010 and November 2010 after learning that his first client had not been paid as promised.

36. Curry testified under oath before the Commission's staff that he became concerned about the Magnum Program in approximately December 2010 as a result of the continued delays. However, he continued to receive additional payments from Lunn after that time without questioning where Lunn got the money to make the payments.

37. Bishop invested her own money in the Magnum Program on June 29, 2010 and brought her first investor into the Magnum Program on July 2, 2010. By at least August 1, 2012, Bishop was aware that the Magnum Program was not performing as promised. Still, Bishop brought at least sixteen additional investors into the program between August 2010 and February 2011. Bishop continued to portray the Magnum Program as a guaranteed investment vehicle even after she learned that her earlier investors had not been paid as promised.

### III. The Defendants' Misappropriations of Investors' Funds

38. The Defendants told investors that WGC Group, Inc. was the holding company for Dresdner Financial and instructed the investors to send their funds via wire transfer to a bank account in WGC Group, Inc.'s name. Lunn owned and controlled WGC Group, Inc. and had

sole control over the bank account that received the investors' money. Lunn admitted during his sworn testimony that he personally processed every transaction that took place in the WGC Group, Inc. bank account.

39. The investors deposited more than $5.77 million into the WGC Group, Inc. bank account between February 2010 and February 2011. Lunn did not invest any of the money, but instead he used the money to make cash withdrawals, to pay the Affiliates, to make a Ponzi-like payment to a favored investor, to provide money to three call girls he met in Las Vegas and to pay his personal and unrelated business expenses. Lunn admitted that he did not tell the investors or Affiliates that he had not invested their money as promised or that he had used the money for other purposes.

40. Lunn withdrew more than $956,000 in cash from the investors' funds between February 2010 and February 2011. Lunn admitted that he began making cash withdrawals from the investors' money after the very first deposit. The WGC Group, Inc. bank account had a negative balance on February 1, 2010. On February 23, 2010, Dresdner's first investor sent $50,000 to the bank account via wire transfer. Three days later, Lunn made a cash withdrawal of $25,000.

41. Lunn transferred approximately $115,000 through more than 140 Western Union transactions to one or more unknown recipients at various locations in New Mexico, Nevada and California. According to Lunn, he intentionally sent less than $1,000 per transfer so that the recipient would not be required to show identification when retrieving the money. Whoever picked up the money from Western Union appears to have reported phony names, phone numbers and addresses. According to Lunn, none of these transfers were sent to investors.

42. In June 2010, Lunn began using investor money to make payments to the Affiliates who brought investors to Dresdner. Lunn described these payments to the Affiliates as either advances on their commissions or personal loans. In total, Lunn paid more than $1.3 million to six of the Affiliates, including more than $650,000 to Curry and Bishop.

43. Lunn used investor money to pay a total of at least $399,930 to Curry through Curry's business, Nevada Capital Markets, Inc. Specifically, Lunn made the following payments to Curry:

| Date | Amount |
|---|---|
| 07/09/10 | $ 20,000.00 |
| 07/21/10 | $ 20,000.00 |
| 08/27/10 | $ 1,400.00 |
| 08/30/10 | $ 2,000.00 |
| 09/27/10 | $ 2,530.00 |
| 09/30/10 | $ 60,000.00 |
| 10/13/10 | $ 75,000.00 |
| 10/15/10 | $ 7,000.00 |
| 10/29/10 | $ 70,000.00 |
| 11/08/10 | $ 35,000.00 |
| 11/18/10 | $ 35,000.00 |
| 11/24/10 | $ 7,000.00 |
| 12/22/10 | $ 25,000.00 |
| 01/31/11 | $ 20,000.00 |
| 02/08/11 | $ 20,000.00 |
|  |  |
| Total: | $ 399,930.00 |

44. Lunn used investor money to pay a total of at least $253,000 to Bishop through Bishop's business, JonDar Enterprises, LLC. Specifically, Lunn made the following payments to Bishop:

| Date | Amount |
| --- | --- |
| 8/16/2010 | $10,000.00 |
| 9/9/2010 | $15,000.00 |
| 9/17/2010 | $100,000.00 |
| 9/27/2010 | $7,000.00 |
| 9/30/2010 | $7,000.00 |
| 10/14/2010 | $7,000.00 |
| 10/15/2010 | $7,000.00 |
| 11/16/2010 | $12,500.00 |
| 11/23/2010 | $12,500.00 |
| 11/29/2010 | $25,000.00 |
| 12/22/2010 | $25,000.00 |
| 2/1/2011 | $12,500.00 |
| 2/8/2011 | $12,500.00 |
|  |  |
| Total: | $253,000.00 |

45. In October 2010, Lunn began making payments to three women he met in Las Vegas, whom he described as "call girls." Lunn testified that he gave the money to the three women so that they could have "a better type of life." Between October 2010 and December 2010, Lunn gave at least $848,500 of investor money to the three women.

46. In November 2010, Lunn used other investors' money to pay $1 million to a favored investor in a Ponzi-like payment. Lunn testified that he gave the money to this particular investor because he thought the investor "was a deserving person."

13

47.     Lunn used essentially all of the remaining investor money to pay for his living and business expenses, including paying his personal mortgages and credit cards and paying WGC Group, Inc.'s creditors. By the end of February 2011, the WGC Group, Inc. bank account had a balance of less than $7,000. Lunn closed the bank account a short time later.

## IV.    Lunn's Attempt to Explain his Fraudulent Conduct

48.     Lunn testified before the Commission's staff that an individual using the alias Robert Perello ("Perello") created Dresdner and the Magnum Program. According to Lunn, Perello told Lunn in the fall of 2010 that he named Dresdner's program the Magnum Program because "when people found out they'd been ripped off, they would buy a .44 Magnum and shoot themselves in the head."

49.     Lunn claimed that Perello threatened to kill him and his family if he did not cooperate in the Dresdner scheme and that he was acting at Perello's direction when he participated in the fraud.

50.     Lunn testified that he gave the cash he withdrew from the investors' funds and the Western Union transfers to Perello.

51.     Lunn was the only person associated with Dresdner who claimed to have met Perello in person. Lunn said that Perello's distinguishing characteristic is that he has only one eye. Lunn testified that he did not know Perello's true identify or current whereabouts. Lunn also testified that he did not report the alleged death threats to the police or any other authorities at the time that they were made.

52.     To date, the Commission has not been able to identify or locate Perello. Regardless of whether Perello exists or had any role in the fraudulent scheme, Lunn is liable for

his own conduct. By his own admissions, Lunn became aware that Dresdner's investment programs were fraudulent by at least May 2010 and continued to accept new investments for the programs through February 2011. Lunn also admitted that he did not tell anyone that Dresdner's programs were fraudulent or seek assistance from anyone to try to put an end to the fraudulent investment scheme.

## COUNT I

### Violations of Securities Act Sections 5(a) and 5(c)
### (Against All Defendants)

53. The Commission realleges and incorporates by reference paragraphs 1 through 52 as though fully set forth herein.

54. By engaging in the conduct described above, the Defendants, (a) without a registration statement in effect, directly or indirectly, made use of the means or instruments of transportation or communication in interstate commerce or of the mails to sell securities through the use or medium of a prospectus or otherwise; or carried securities or caused securities to be carried through the mails or in interstate commerce, by means or instruments of transportation, for the purpose of sale or for delivery after sale; and (b) without filing a registration statement, directly or indirectly, made use of the means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or to offer to buy securities through the use or medium of a prospectus or otherwise.

55. By engaging in the conduct described above, the Defendants, directly or indirectly, violated, and unless enjoined will again violate, Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a) and 77e(c)].

## COUNT II

### Violations of Exchange Act Section 10(b) and Rule 10b-5
### (Against All Defendants)

56. The Commission realleges and incorporates by reference paragraphs 1 through 52 as though fully set forth herein.

57. By engaging in the conduct described above, the Defendants, in connection with the purchase or sale of securities, by the use of the means or instrumentalities of interstate commerce, or of the mails, or of any facility of any national securities exchange, directly or indirectly:

    (a) employed a device, scheme, or artifice to defraud;

    (b) made an untrue statement of material fact or omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or

    (c) engaged in an act, practice, or course of business which operated or would operate as a fraud or deceit upon another person.

58. The Defendants acted with scienter when they engaged in the conduct alleged above.

59. By engaging in the conduct described above, the Defendants, directly or indirectly, violated, and unless enjoined will again violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## COUNT III

### Violations of Securities Act Section 17(a)(1)
### (Against All Defendants)

60. The Commission realleges and incorporates by reference paragraphs 1 through 52 as though fully set forth herein.

61. By engaging in the conduct described above, the Defendants, in the offer or sale of securities, by the use of the means or instruments of transportation or communication in interstate commerce, or by the use of the mails, directly or indirectly, employed a device, scheme or artifice to defraud.

62. The Defendants acted with scienter when they engaged in the conduct alleged above.

63. By engaging in the conduct described above, the Defendants, directly or indirectly, violated, and unless enjoined will again violate, Section 17(a)(1) of the Securities Act [15 U.S.C. § 77q(a)(1)].

## COUNT IV

### Violations of Securities Act Sections 17(a)(2) and 17(a)(3)
### (Against All Defendants)

64. The Commission realleges and incorporates by reference paragraphs 1 through 52 as though fully set forth herein.

65. By engaging in the conduct described above, the Defendants, in the offer or sale of securities, by the use of the means or instruments of transportation or communication in interstate commerce, or by the use of the mails, directly or indirectly, obtained money or property by means of an untrue statement of a material fact or an omission to state a material fact

necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or engaged in a transaction, practice or course of business which operated or would operate as a fraud or deceit upon the purchaser.

66. By engaging in the conduct described above, the Defendants, directly or indirectly, violated, and unless enjoined will again violate, Sections 17(a)(2) and 17(a)(3) of the Securities Act [15 U.S.C. §§ 77q(a)(2) and 77q(a)(3)].

## COUNT V

### Violations of Exchange Act Section 15(a)
### (Against All Defendants)

67. The Commission realleges and incorporates by reference paragraphs 1 through 52 as though fully set forth herein.

68. By engaging in the conduct described above, the Defendants made use of the mails or of the means or instrumentalities of interstate commerce to effect transactions in, or to induce or attempt to induce the purchase or sale of, securities without registering with the Commission as a broker or dealer.

69. By engaging in the conduct described above, the Defendants, directly or indirectly, violated, and unless enjoined will again violate, Section 15(a) of the Exchange Act [15 U.S.C. § 78o(a)].

## RELIEF REQUESTED

**WHEREFORE**, the Commission respectfully requests that this Court enter a Final Judgment:

### I.

Permanently restraining and enjoining the Defendants, their officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, and each of them, from violating Sections 5(a), 5(c), 17(a)(1), 17(a)(2) and 17(a)(3) of the Securities Act [15 U.S.C. §§ 77e(a), 77e(c), 77q(a)(1), 77q(a)(2) and 77a(a)(3)], Sections 10(b) and 15(a) of the Exchange Act [15 U.S.C. §§ 78j(b) and 78o(a)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5];

### II.

Ordering each of the Defendants to disgorge, with prejudgment interest, all ill-gotten gains received as a result of the conduct alleged in this Complaint;

### III.

Ordering each of the Defendants to pay civil monetary penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)]; and

## IV.

Granting such other and further relief as this Court may deem just and proper.


October 18, 2012                                  Respectfully Submitted,

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**

s/ Jedediah B. Forkner              __

Gregory vonSchaumburg (IL Bar No. 3127782)
Anne C. McKinley (IL Bar No. 6270252)
Jedediah B. Forkner (IL Bar No. 6299787)
U.S. Securities and Exchange Commission
Chicago Regional Office
175 West Jackson Boulevard, Suite 900
Chicago, Illinois 60604
Telephone:  (312) 353-7390
Facsimile:  (312) 353-7398
Email:  vonSchaumburgG@sec.gov
Email:  McKinleyA@sec.gov
Email:  ForknerJ@sec.gov